## THE INDIANA AND EBENSBURG TURNPIKE ROAD COMPANY *against* ARMOUR PHILLIPS.

The Legislature passed an act, to authorize the incorporation of a company for the purpose of making a turnpike road, between specified points ; books were opened by the commissioners appointed to take subscriptions of stock, at two different places on the contemplated route ; but subscriptions to an amount sufficient to authorize the granting of a charter, were not obtained.   A supplement to the original act was then passed, which divided the contemplated road into two parts, authorized the granting of two charters, and provided, that those who originally subscribed for stock, at a certain place, should be members of one of the companies; and those who subscribed at another place, should be members of the other. *Held:* That the latter act is unconstitutional: and that one of said companies cannot recover from an original subscriber, the amount of stock subscribed by him.

ERROR to Indiana county.

This was an action in which the plaintiff in error was the plaintiff below, and brought to recover from the defendant the amount of his subscription to the stock of the *Armstrong, Indiana, and Cambria turnpike road company.*

The following special verdict was agreed to by the parties:

By an act of the general assembly of Pennsylvania, passed the seventh day of February, 1818, the governor of the commonwealth was authorized to incorporate the *president and managers of the Armstrong, Indiana and Cambria turnpike road company;* and by the act commissioners were appointed to receive subscriptions for stock in said company.

On the 14th day of September, 1818, at Indiana, the defendant, *Armour Phillips* subscribed for four shares of stock.

On the 27th day of March, 1819, the general assembly of Pennsylvania passed an act entitled, "A supplement to an act entitled, an act authorising the Governor to incorporate the president and managers of the *Armstrong, Indiana and Cambria turnpike road company,*" authorizing the governor of the commonwealth to incorporate two companies in lieu of the *Armstrong, Indiana and Cambria turnpike road company,*—the one thereof to be styled " *The Indiana and Ebensburg turnpike road company,*" and the other to be styled "*The Armstrong and Indiana turnpike road company;*" and dividing the stock subscribed under the former act, to which the latter act was a supplement.

The defendant *Armour Phillips,* on the 27th of March, 1819, resided on Yellow Creek, east of the borough of Indiana.

(Turnpike company *v.* Armour Phillips.)

The governor of the commonwealth of Pennsylvania, by letters patent, under the seal of the commonwealth of Pennsylvania, bearing date the 13th day of December, 1820, granted a charter to the plaintiffs, by the name and style of " *The Indiana and Ebensburg turnpike road company.*"

On the 4th day of December, 1821, the president and managers of the *Indiana and Ebensburg turnpike road company*, by a resolution, of which public notice was given in the newspapers of the county, required payment of three dollars upon each share of stock, subscribed by each stockholder, to be paid on the 1st of March, 1822, to the treasurer of said company. Six other instalments were called in, in like manner.

If the Court shall be of the opinion that the plaintiffs are entitled to recover, then judgment to be entered for the sum of one hundred and twenty-eight dollars and twenty-five cents. If the Court shall be of opinion that the plaintiffs are not entitled to recovery, judgment to be entered for the defendant.

*Young, President,* directed a judgment to be entered for the defendant.

*White* for plaintiff in error.

As the act of 1st April, 1823, entitled "An act relative to turnpike roads and bridge companies," &c., has been recognized by the Supreme Court in the case of *Ogle* v. *The Somerset and Mount Pleasant Turnpike Road Company*, 13 *Serg. & Rawle*, 256, and has been considered binding in all suits brought after the passage of that act: I presume no advantage can be taken in this case of the non-payment of the three dollars, at the time of the subscription, upon each share of stock subscribed.

The subscription of the defendant having been made to the commissioners appointed by the original act of the 7th February, 1818, and while that act was in force, the question on the case stated, is whether the legislature had authority to pass the act of 17th March, 1819. If they possessed such authority, the defendants are within the 4th section of that act, and the plaintiff is entitled to recover.

The object of the supplementary act was to aid the subscribers in accomplishing the intention of the original act, in a more speedy and convenient manner. It was found that the distance was too great and required the co-operation of too many persons, to enable them to attain the object contemplated, and it was, therefore, deemed expedient to divide the original company, which was accordingly done, at the same time, as it was not to be expected that any man subscribed with an intention of refusing payment when the road was completed. The original subscription theretofore made was preserved.

24

(Turnpike company *v.* Armour Phillips.)

Did the supplement impose another or a greater burden than existed upon the part of the subscribers under the original act? The amount of stock required to be subscribed previous to the issuing of the letters patent to either company, by the supplementary act, is precisely the one half of that required, by the original act, to be subscribed by ten persons instead of the whole amount by twenty persons. The distance was also equally divided. The ultimate value of the stock would be the same, the subscriber being a participator in the profits of half the distance contemplated, in common with half the number of subscribers originally designed. Can this be said to be more onerous? Can it be said that it is a departure from the object originally contemplated, viz: the formation of a turnpike communication from Ebensburg to Kittanning? It is neither more nor less than the adoption of an easier mode of reaching the original object; but in no other way could it have been attained than by legislative aid and sanction

But it is objected that the supplementary act has a retrospective operation. It is true, "that the general rule is, that all laws are in their nature prospective; yet this does not prohibit the legislature from passing some laws which have a retrospective operation; where the laws do not impair the obligation of a contract. Every confirmatory act is, in its nature, retrospective, and in this case, the Court decided that the act of 3d April, 1826, curing defective acknowledgments of *femes covert,* was constitutional, although the property conveyed had been formerly the estate of the wife, and but for the passage of that act of assembly the plaintiffs were clearly entitled to recover. *Tate et ux* v. *Stoolfoos,* 16 *Serg. & Rawle,* 37. In *Underwood* v. *Lilly,* 10 *Serg. & Rawle,* 101: "Confirming acts are not uncommon. Deeds acknowledged defectively by *feme coverts*—proceedings and judgments of commissioners and justices of the peace, who were not commissioned agreeably to the constitution, or where their powers ceased, upon a division of counties, until a new appointment"— "retrospective laws which only vary the remedies, divest no right but merely cure a defect in proceedings otherwise fair—the omission of formalities, which do not diminish existing obligations"— these and several like acts are constitutional.

So the act of 22d March, 1817, giving the remedy to recover upon notes issued by unincorporated banking companies, was decided to be constitutional. *Hess et al.* v. *Werts,* 4 *Serg. & Rawle,* 364.

"It removes the impediment to recover upon a contract entered into by the defendant. It is so far retrospective—but every retrospective law is not void."

"Every law that is to have an operation before the making thereof—as to commence at an antecedent time, or to some time

(Turnpike company *v.* Armour Phillips.)

from the statute of limitations, or to excuse acts which were unlawful and before committed, and the like is, retrospective; but such laws may be necessary and proper."—*Duncan, J. ib.*

"This law divests no right but removes an impediment—it renders lawful an unlawful act, as if it had been lawful; it impairs no man's contract, but takes from the contract the taint which the policy of the moment imposed on it."—*Ib.*

What is there in the 4th section of the supplement more than a confirmation of the original subscription? It applies it as it was intended by the subscribers.    That made at Indiana to the making of the road from thence to Ebensburg; that made at Kittanning, towards the making of the other section.    Does it impair the contract? If so, in what manner? It does not take away any remedy the stockholder had to enforce the contract on his part.    It does not give less force and efficacy to his vote in the concerns of the company.    What vested right had he which has been taken away? It does not impose any additional clog or weight upon the stock that he subscribed for.    Then of what can he complain, except that he is called upon to fulfil a contract which he has signed?

The effect of the 4th section, is nothing more than to give validity to the stock which had been subscribed, and which, upon the division of the company, might have been lost for the want of a remedy to recover it.    It is to cure a defect which would have existed, but for the provision contained in this section.    It is only varying the remedy, and instead of collecting the stock and dividing it between the two companies, giving the remedy to each company, to recover that which had been subscribed within its precincts.    It does not divert the subscription to a different purpose from what was originally intended, but gives the subscribers the further advantage of being able to oversee the expenditure of the money which they had subscribed, in their own neighborhood.    It removes a disability which would have existed in the way of recovering the stock, had it been suffered to remain in its original state.    The original company could not have recovered it—never having been incorporated—and it was necessary to place the remedy to cure this evil in the hands of somebody.

In the late case of *Satterlie* v. *Mathewson*, 16 *Serg. & Rawle,* 169, the Supreme Court went so far into the doctrine of the removal of disabilities, as to carry into effect the act of 8th April, 1826, (establishing the relationship of landlord and tenant, between Connecticut settlers,) although that act was passed after the commencement of the suit, and was virtually changing the rule of law as laid down by the Supreme Court, for the decision of such cases, upon the principle that the parties at the time that relationship commenced had not in view any disability which either of them labored under.

*Judge Huston,* in delivering the opinion of the Court, says, the

(Turnpike company *v.* Armour Phillips.)

legislature in this case have not affected any right. They have not prescribed a rule in any particular case. They have taken away a disability which, they thought, ought never to have been imposed, and which they thought did not exist when the contract was made.

What is there more in the act of 1819, except providing for a disability which would have existed, but for their providing for the collection of the stock which had been subscribed. It is only directing the stockholders in which way they may pay the money, in order that the object they had in view when they subscribed, might be brought to a speedy consummation; but which, notwithstanding the length of time they have been indulged, does not seem to be "devoutly wished for," on their parts. The road has been completed by the exertions and with the funds of others, and they now wish to withhold what they had engaged to pay in furtherance of the general good.

This principle of varying the persons who are to receive money subscribed in furtherance of a particular object, is not a novel one in our Court.

In *Davis* v. *Meade et al.* 13 *Serg. & Rawle*, 282, the Court held that the plaintiffs below were entitled to recover, although they were fifteen in number, and the original subscription had been made to three only. When the addition had been made by two acts of assembly, passed 2d April, 1802, and 4th April, 1805, respectively, and there had been several subsequent acts of assembly changing the number of trustees; under one of which acts the defendants could at one time have had the suit dismissed upon application to the Court below.

Even in the case of a change in alteration of the name of a corporation, it does not lose its franchises. *Mellan* v. *Spateman*, 1 *Saun.* 344. *Cilchester* v. *Seaber*, 3 *Burr.* 1870.

And the corporation under the new name would retain all its possessions that it had before, and shall recover, in that name, debts due before. 1 *Saunders*, 344, in *note* (1.)

This principle has been recognized in its full extent, by our Supreme Court, in the case of the *Overseers of North Whitehall* v. *The Overseers of South Whitehall*, 3 *Serg. & Rawle*, 117.

It was there decided that by the division of the original township of Whitehall, this corporation of overseers of the poor, was not annihilated, but that the two corporations contending, grew out of it, and were subject to the same liabilities by which the original corporation was bound and entitled to the same rights, and although the case did not require a decision of the point, the Chief Justice intimates plainly, that the property held by the old corporation, would be divided between its successors, and would not revert to the donors.

(Turnpike company *v.* Armour Phillips.)

By the 16th section of the act of 9th March, 1771, the over-seers of the poor of every township are constituted a corporation, and empowered to hold property to the yearly value of five hundred pounds, and by the division of a township, which is done by an application to the Court of Quarter Sessions, and upon the election of overseers, they become *ipso facto,* a corporation, and according to the principle decided in the case last cited, entitled to have their proportion of the property belonging to the old corporation, from which they were stricken off, and this without any direct legislative provision upon the subject, but merely by implication of law, founded upon the reason and justice and expediency of the measure.

If then this be the result of dividing a corporation already in existence, how much stronger is the case of the present plaintiff? Suppose the company had been incorporated under the original act, and it was found expedient to divide it into two corporations, as in the present case, and I take it for granted that, with consent of the original corporation, this could be done; and their consent could only be necessary because the letters patent had been issued; and till that is done, no consent is necessary, because there is no charter of privileges in the way.   I ask, in that case, what would become of the subscriptions remaining unpaid? After the principles cited, will it be contended that the subscription was extinguished, or rather must it not be considered that the subscription belonged in equal proportions to the two new corporations growing out of, and based upon, the original incorporation? This seems to be the result of the principles laid down in the cases cited, and we are not embarrassed by the difficulty that might arise as to what mode should be adopted to recover the debt due as the course has been directed by the act of assembly, authorizing the division of the stock upon fair and equitable principles.

If a corporation can be divided, and the rights and duties incident thereto yet subsist, how much stronger is the case of division before any charter granted? If upon the division these rights and duties subsist by implication—where the division itself is made by a tribunal deriving its authority from the legislature—how much stronger is the case where the division is made by the legislature and the division of rights and duties is expressly defined by the legislature, in the act giving authority for such division?

If it had been the division of an existing corporation, it is clear, from the cases cited, that these debts would not have been annihilated, the only difficulty would have been what mode was to be pursued to recover them.   Would it be in the name of the old corporation for the use of the two subsequent ones?   Or would each proceed for their proportion?   To avoid these difficulties the remedy is provided by the 4th section of the supplement.   It does

not impair a contract, but in the language of the Court, in *Stoddart* v. *Smith*, 5 *Binn*. 355, "It merely gives a new remedy to enforce a contract previously entered into," and therefore it is not unconstitutional.   It deprives no man of his property like the act confirming the Connecticut claims.  It divests no right which had been acquired, but is simply a confirmation of a contract which had been entered into, and an appointment of a remedy and a mode of enforcing it, lest peradventure it might fail.  In *Estep, et al.* v. *Hutchman, et al.* 14 *Serg. & Rawle*, 438, the Supreme Court decided that an act of assembly authorizing guardians to convey real estate, which their parent had contracted to sell in his lifetime, was valid, and the conveyance vested the estate.  This, upon the ground that there must exist a power somewhere to give a remedy to prevent failure of contracts, where, from circumstances, the contract cannot be enforced by or amongst the persons originally parties thereto.

So far has the principle of confirming contracts been carried by the legislature, that they have supplied the want of evidence upon the part of turnpike companies, necessary to maintain suits against delinquent subscribers to the stock, and have made the circumstance of their having voted at an election for officers of the company sufficient to charge the defendant with an equal number of shares to what he represented himself entitled to at such election, and have made valid all charters obtained upon subscriptions which were fictitious, or by persons deemed insolvent.   This act of 10th April, 1826, has been recognized by *Duncan, J.* in delivering the opinion of the Court in *The Kisacoquillas and Centre Turnpike Company* v. *McConahy*, 16 *Serg. & Rawle*, 147, and his termed by him the healing act, without intimating a doubt of its constitutionality.

This act became necessary in consequence of the difficulties under which the various turnpike companies throughout the state labored in attempting to recover subscriptions which had been made of stock in the respective companies. After the roads had been completed at the expense of some of the stockholders and by contracting debts to individuals, many refused to pay what they had contracted, and from some irregularities or want of evidence they were like to escape; and many would have escaped but for the interference of the legislature, curing all defects, and prescribing a remedy for the evils complained of; in fact, doing no more than was done by the supplement under which the present plaintiff was incorporated—confirming a contract and pointing out a course to compel the payment of subscriptions which would have been lost for the want of an adequate remedy.

If upon the incorporation of the original company contemplated, the right to the subscription would have remained notwithstand-

(Turnpike company *v.* Armour Phillips.)

ing the subsequent division of that company, though the remedy to recover that subscription might be hard to point out, it cannot be contended with success that the legislature could not under their general powers, do that before incorporation which could be done under certain circumstances after charter granted; and if the point is established by the cases cited, the minor one is a necessary consequence of that being established. It is merely pointing out a remedy to enforce a contract which was valid and binding, but which, from the constitution of our courts, there might have been difficulty in enforcing; and that they had authority to supply this remedy is abundantly proved by the authorities. We do not ask to divest any right to which the defendant was entitled; we do not impair the obligation of any contract which had existed, nor impose any additional burden upon him which was not in his contemplation at the time he made the subscription. The object towards the completion of which he subscribed, has been attained; and we now ask that he shall perform his contract, and pay the amount which he voluntary subscribed.

*J. B. Alexander* for defendant in error.

For the defendant, it is readily admitted that the non-payment, at the time of subscription, of the money which ought then to have been paid on each share of stock subscribed, cannot be objected against the plaintiff's recovery. The act of 1823, operating by way of confirmation of an inchoate right, makes the defendant a stockholder in the corporation named in his subscription, if it be yet in existence, as fully as though the payment had been made at the time of subscription.

The defendant by his subscription became one of a company, when incorporated, by the title set forth in the case, and to that company only he contends he is responsible. The scene of operations of that company was to extend from Ebensburg, at the eastern extremity, and to embrace Indiana, in the centre, and Kittanning at its western termination.

That company, without any participation in the measure by the defendant, was by a subsequent act of the legislature, divided into two companies, or rather two new companies were formed to operate on the same extent of country—one on the eastern half of the road contemplated to be made, the other on the western half.

Could the legislature thus divide the original company? Could the corporators be divided at the pleasure of the government, without their consent? Is the defendant a stockholder in either of these new corporations? Can he be sued by either of them on his subscription to the original company? It is contended that each of those questions must be answered in the negative.

(Turnpike company *v.* Armour Phillips.)

The defendant contends that by his subscription he became one of a company with whom the state had entered into a contract for certain purposes—that he is or was bound by the terms of that contract, and that he is answerable on no other engagement but that one.

He says the rule is well established that in an action on a contract, the plaintiff must prove his contract as laid or he cannot recover ; but the proof in the case litigated shews a contract with a different party, and different in extent. He says that what is now shewn, is not proof of a contract made by him, nor by any one for him, with his assent. My bargain, he says, is with the *Armstrong, Indiana and Cambria Turnpike,* and not with the *Indiana and Ebenrburg Turnpike Company.* On this statement he is entitle to judgment unless something more be shewn.

The plaintiff in answer says, the same power which created the first corporation has thought proper to change it, and to abridge the extent of its rights and privileges, and make you a member of another company, having a new name, and to make a subscription for you, by the act of 17th March, 1819, and that the plaintiff can therein well maintain this action.

Now it is submitted by the defendant that this case is clearly within the prohibitions contained in the constitutions of the United States, article I, section 10, that "no state shall pass any bill of attainder, *ex post facto* law, or law *impairing the obligation of contracts.*" And that it is also embraced in the 9th article, 17th section of the constitution of Pennsylvania which declares that "no *ex post facto* law, *nor any law impairing contracts shall be made.*"

Inasmuch as the act of 1819 attempts to make a new contract between the corporators—as it entirely alters the situation of the parties—as it essentially impairs the contract made by the defendant under the act of 1818, it is contended it is inoperative.

And here the inquiry very naturally presents itself, whether the act of incorporation of 1818 amounts to a contract within the meaning of those constitutional provisions.

It is not believed that any argument is necessary to prove that the government of a state may be a party to a contract with one, or some of its own citizens. Nor can it be necessary to prove, that an act of incorporation by the supreme power of the state is a contract with the persons incorporated, that they shall have the corporate powers thereby granted to them.

In *Fletcher* v. *Peck,* 6 *Cranch,* 136, Chief Justice Marshal in deciding on the validity of an act of the legislature of Georgia says, "a contract is a compact between two or more parties and

(Turnpike company *v.* Armour Phillips.)

is either executory or executed,"—"A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant in its own nature amounts to an extinguishment of the right of the grantor, and implies a contract not to re-assert that right."

Now it cannot be objected by either party to this controversy, that the commonwealth had not a right to erect a corporation, and to grant to it the powers necessary to enable it to make the turnpike road mentioned in the act of 7th February, 1818.

It is also made a part of the case that the Commonwealth did exercise that right, and make the requisite *grant* of power. It thereby parted with its right over that subject. That grant of power was met by a subscription of stock, and the state could not re-assert its right over the matters granted. If it was a contract executed it cannot be altered but with the consent of all the parties to it, or because of misuser of the powers granted. If it was a contract executory, a new scheme, or modification of it will only be binding on those who accede to the new terms.

The subscription being made under the act of 1818 the Governor could not refuse the charter. A contract was made between the state and the stockholders—it was a compact between two parties—a grant on the part of the one, and an acceptance on the part of the other. There was the union of two minds on the same subject, clearly expressed and fully understood. There was an implied contract that the government, who was the grantor would not re-assert its right over the privileges and powers granted. This understanding was binding on the parties on general principles, as well as by the particular provisions in the constitutions as they are relied on.

It will be readily seen that the objections of the defendant to the act of 1819 do not rest so much on an alleged diminution of the value of his subscription, as on the principle assumed by his adversary, that the legislature may at their pleasure vary the terms of their grant.

If there be in the government a power to alter the terms of the grant in one particular, the same power will extend throughout the compact, and may be made to operate on every part of it. Any change in a contract or in the circumstances connected with it, so as essentially to alter the situation of the contracting party dissolves that contract. It is admitted by all that this is the rule as between individuals, and the counsel for the defendant knows of no reason why the same rule should not be applied to the existing controversy. Indeed the reasoning of Chief Justice Marshal, and his exposition of this constitutional prohibition and restriction, on the state legislatures, would seem to require more caution and circumspection, in permitting a change when the state is

25

(Turnpike company *v.* Armour Phillips.)

a party, than when the subject matter is interesting to individuals only. 6 *Cranch,* 137.

This very provision against unlimited power in legislation he designates as a *bill of rights for the people*—a bill to protect the people against legislation on matters not properly subject to discussion in any other forum than a judicial one.

It is against the adoption of any such principle that resistance is now made. It is believed to be erroneous in every view, it is unjust, and directly adverse to the constitution of the U. S. and of Pennsylvania.

The formation of two companies to construct two roads over the same ground, and to the same extent precisely, and in *lieu* of one company having a priority of organization, cannot possibly be valid if the first corporation remain.

If the act of the legislature erecting the first corporation be repealed, the corporation itself must, by the terms of the repealing act be dissolved.

If it be repealed, and the corporation be dissolved, its responsibilities are ended, its rights to sue are ended, and its claims terminated.

All this must be evident, because, the present actions are founded on this notion, that the first corporation is dissolved, and its rights of action, to a certain extent, are transferred by operation of the repealing statute, to the new corporations. If this be so, the defendant is not shewn to be a party to that new contract, so as to give a right of action.

But can any division of a corporation, and of its rights, its privileges, and powers, be made, so as to bind the members, and transfer those members and their stock to one of the divisions, without their consent. This would be making a new bargain for the parties, which the legislature cannot do.

The defendant was a member of a corporation with power and rights extending over say 50 miles of territory, and embracing the whole line of transportation between that part of the Allegheny mountain where it terminates, and the Allegheny river at Kittanning, where it commences. Surely these rights must be impaired, if they are restricted to one half the distance by a subsequent interference of the authority which created the corporation.

The authorities cited, and positions maintained by the plaintiff's counsel, will be now met and answered.

If the law of 1819 had been enacted for the mere purpose of supplying some *casus omissus* in the act of 1818, it would have been a fair subject of legislation. If it had merely altered a *remedy,* without infringing on any right, it could not be said to be oppressive or unjust.

If it had merely changed the *name* of the corporation by the consent of the stockholders, however informally applied for, it might perhaps have been within the principle of former decisions. But to change, alter, lessen, increase, or destroy the integral parts of the corporation, must be resisted.

It is said it was deemed expedient to divide the original company, because it was too extensive. Perhaps it was so, but the present defendants never gave their assent to that expediency.

It is said the burden of the stockholders is not increased. But how is that known? Is not a mile of turnpike near to the navigable waters of the Allegheny river more productive than a similar distance on the face of the Allegheny mountain? And whether it be so or not, if the party wishes to have an interest near the river, and obtains it, you cannot against his will, send him to the mountain. He may well say *non in hæc foedera veni.*

It is not objected that the act is *retrospective* further than it assumes to itself the power to make a new contract. So far it is alleged to be unconstitutional.

It is not a *confirmation* of the original subscription, but an attempt to destroy it, by depriving of existence the party with whom it was made, viz., the corporation, and which must be in full life and vigour, with all its original rights unimpaired, to continue the operation of the contract on the other party. But that corporation is destroyed; so there is an end of its rights.

It is not the *removal of a disability* that is complained of, but it is the interposition of an insuperable obstacle to the success of the scheme, by the legal destruction of one party to the contract— the corporation itself; and the introduction of another corporation in its place, a mortal and deadly enemy to its existence.

It is not *varying the persons* who are to receive the money for a particular object, but it is varying, and entirely changing, the object itself.

The counsel for the defendant cannot see the similarity between the case of the Court of Quarter Sessions, under the provisions of the act of 1803, dividing a large township, and making two of it; and the case before the court. But if the case of *North Whitehall* v. *South Whitehall,* be at all important, it is the position there laid down as supported by good authority, that the dissolution of a corporation is also a virtual dissolution of all its responsibilities.

And if the corporation be freed from all responsibilities, it surely loses all its claims; and this is the very reason why in all our acts of incorporation a clause is inserted, continuing the rights and responsibilities after the dissolution. But has there been any case where those rights and responsibilities have been thrown to

and on, another corporation. It is believed the present case is the only one of the kind. It is indeed *sui generis*.

It is not giving a *new name* to a corporation, but it is making two corporations out of one, with different names and with purposes and extents of privileges essentially different.

These answers seem to be satisfactory, and shew that the arguments of plaintiff's counsel do not apply to the case.

To make the act of dissolving the first corporation and the erection of the new ones, binding on the present defendants much more must be shewn than exists in this case. There must be the assent of the parties.

"A patent procured by some few persons only, shall not bind the rest: nor can the inhabitants of a town be incorporated without the assent of the major part of them.

"So a statute incorporating certain persons, will not bind one who is named unless he assents to it. 2 *Ba. Ab.* 3 *Roll. Rep.* 226, 2 *Mass. Rep.* 269.

The argument of Mr. White for the plaintiff merits a much more deliberate examination than can be afforded by the defendant's counsel at present. It is however believed that his positions and authorities are in the main met by what has been already said.

The opinion of the Court was delivered by

Gibson, C. J.—Under an act of incorporation, the defendant subscribed the shares which are the subject of the action, in the stock of "*The Armstrong, Indiana and Cambria Turnpike Road Company.*" Of this company, which did not go into operation, the legislature formed two distinct incorporations, of which the plaintiff is one and the owner by apportionment, if any thing were recoverable, of the defendant's subscription. From this state of the case, it is impossible to avoid a conclusion that the supplementary act is, as regards original stockholders who have not consented to be arranged to either of the new incorporations, in direct collision with the tenth section of the first article of the constitution of the United States, which among other limitations of state power, prohibits the enactment of laws impairing contracts: and notwithstanding our deference to the legislature, we are bound to give effect to the constitutional provision, though at the expense of our common law. The defendant was entitled to his proportion of the tolls received on the whole route, instead of perhaps the least productive half of it; and to enforce his part of the contract without giving him the benefit of the entire thing for which he stipulated, would impair its obligation in a most material part. It is not to be doubted that the supplemental act was founded in a presumption of common consent, drawn from an application by a majority of the original stockholders; and in that view it

(Turnpike company *v.* Armour Phillips.)

would be fair to intend that the legislature did not, in fact, mean to dispose of the subscriptions of those who should not choose to become parties to the arrangement. The defendant has not thought fit to become a party, and his subscription cannot be demanded.

HUSTON, J.—This case has been argued as if it turned on the power of the legislature to pass an act, compelling the defendant to pay the money demanded, under the circumstances of this case; and has been disposed of by a majority of this Court, as if it depended on such power. On first reading the case, and the act of 27th March, 1819, it struck me, that a construction was put on it by the plaintiff, and partly admitted by the defendant, which those who passed the law never thought of. The act throughout, bears evidence of having been hastily drawn; in many respects it is vague, if not obscure. It does not appear whether the company, to divide which the law was enacted, existed or not; or rather, one would be led to suppose there was such a company. When in fact only a few shares had been subscribed, and no charter had been obtained, it was pretty certain none would be obtained. Thus, the act which purports to divide a turnpike company, was in fact made to enable two new companies to be formed; each of which was to make part of the road contemplated by the former company. The fourth section enacts, that the subscriptions already made to the commissioners appointed by the act to which this is a supplement, *shall and may be lawful;* and shall be applied in manner following, &c., and prescribes that those made at Kittanning shall be in part of the western company, and those at Indiana in part of the eastern, i. e. the plaintiff's; and strange as it may seem, says nothing of those at Ebensburg, or any other place. There has been some discussion as to when, in an act of assembly, the word *may* means *shall* and *e contra,* the amount of which is, that when from the subject, the object and the context, that meaning is required, we must so understand it; but where none of these require it, the word should have its common meaning. If the words "*and may*" had been omitted, it would not have been entirely clear, that the meaning was the same, as if the words "shall be obligatory on the subscriber," had been used. To me it seems not allowable to reject the words "and may," and to change the words "be lawful," into "be obligatory." In short, I consider the law as leaving it optional with the subscriber. The records will bear this construction better than that given to them in the argument: and I am persuaded this gives the meaning of the legislature. I add no new words, I reject no word, and I change none. It is allowable to transpose words to effect a meaning, or get clear of an absurdity. I agree that the judgment be for the defendant, because the option was given him.

Judgment affirmed.